All right. Mr. Heyer, we're happy to hear from you. Thank you, Your Honor. May it please the Court. Your Honor, just to start off, I wanted to, on the assumption maybe the members of the Court aren't super familiar with all the different types of vaping products out there, I wanted to just provide a little bit of background because it actually ends up being quite important, I think, to the Court's analysis. I don't think we're going back there and vaping after this. And there are sort of three fundamental subcategories here that are at issue. There are bottled e-liquids, which are nicotine-containing fluids, which are the only products at issue with this particular application for avail for the petitioners. There are cartridge-based products. Oftentimes these look like those USB stick memory drive things. Juul is a familiar brand. And then there are disposable products, which are functionally virtually identical to the cartridge-based products, except instead of swapping out the cartridge that has the e-liquid in it, the entire device gets tossed in the garbage once it's expired. For all of these products, and this is important, this is a background setter, FDA, it's important, these products are fundamentally distinct from combustible cigarettes in terms of the harm profile that they present. FDA itself, and this is in the TPL report, it's J34, recognizes that N's as a category are generally likely to have fewer and lower concentrations of harmful and potentially harmful constituents than combustible cigarettes. And biomarker studies demonstrate significantly lower exposures to those HPHCs, as they're called, among current exclusive N's users than current smokers. And this is otherwise in the literature, but the Royal College of Physicians in the UK has, as a class, said that these products are 95% less harmful than combustible cigarettes. So I just wanted to set that by way of background. And avails target audience for these, market for these products are the 37.7 million adult consumers of combustible tobacco products that they would like to have switched to their products, which are significantly less harmful. Now, why is this particular... These are flavored, right? I'm sorry? These are flavored. That's what, excuse me, distinguishes them from things that have been approved, right? Correct. The ones in this particular application, this bundled application, were all flavored. None of them were tobacco flavored. And isn't there evidence that flavored... What do you call these things? E-liquids? What do you call them? E-liquids, exactly, Your Honor. Okay, but these flavored E-liquids are more appealing to young people. There is evidence, but flavored E-liquids are also used, Your Honor, probably 85% to pick a round number of adults use flavored E-liquids as well. So they're used across all age groups. But the distinction is very important. And when we talk about what the Fifth Circuit Motions Panel described as the surprise switcheroo, it really can be boiled down to this. And I think this really is brought to the fore by Chief Judge Pryor's opinion in the Eleventh Circuit. To the extent that one wants to go down the rabbit hole of looking at FDA's 2020 enforcement guidance, on which the agency heavily relies, about what the agency was signaling about the attractiveness to youth of flavored products, that guidance was essentially saying it's cartridge-based. It's a cartridge-based subcategory of products that are particularly attractive to youth. And that's because, and the record shows this, the guidance says this, there are particular features of those that are also common to disposable e-cigarettes as well. I guess your argument is overlooking one thing, and that is essentially the statute gives the FDA a good bit of discretion. Because the pre-marketing authorization is tied to what would be appropriate for the protection of the public health. And so it seems to me that when you look at the Tobacco Control Act, that the FDA was acting in accordance with it. It's just taking the standard of review, it's hard to see how the FDA's action is arbitrary and capricious, given the number of factors that support its decision, including the one that my colleague, Judge Motz, just mentioned. And that is that flavors attractive to children and adolescents, because children are naturally attracted to candy and sweets. And that these flavored cigarettes may be introducing a whole new generation to nicotine addiction and smoking. And that was just one of the things that the FDA had in front of it. And I don't know what authority we have under the statute to simply throw that out and say, Your Honor, if I can be heard on that, that's the lens through which FDA wants this court to look at this. Look at the outcome. This is fundamentally a procedural challenge here. And let me get back to the point I was attempting to make before. FDA said prior to the September 9, 2020, deadline to submit these applications to the extent FDA... It's not just a procedural challenge, no. It's a challenge to the denial of the pre-marketing authorization. That's a very substantive decision. You don't like it. They thought it was necessary for the public health. That goes to me beyond procedure. Now, to the extent that you're talking about procedure, you're saying, Well, the FDA can't consider this type of evidence or that it needs this type of clinical study or that type of study. But as I read the statute, it doesn't allow us to cabinet the FDA's approval process into, You can consider this piece of evidence, but not that. It gives them some flexibility to apply their expertise to what's appropriate for public health. And they come with a bottom line saying we don't want to introduce a whole new generation of Americans to smoking and the public health risks that go along with it. I mean, you know, today's flavored cigarettes are tomorrow's emphysema wards. And it's not an arbitrary and capricious position for the Food and Drug Administration to take. They've looked at these studies. They have more expertise than I do, for sure. May I please finish my thought, Your Honor, because this is a very important procedural point here. In the 2020 enforcement guidance, FDA said it's cartridge-based flavored products that are particularly attractive to youth. Ten months after these applications were due, without notice to industry, and it's in the August 17, 2021, internal memo, FDA expanded that internal scientific determination to all flavored products, without giving notice to industry, without accounting for industry reliance on that. And that then was the fundamental basis for this new standard for evidence that FDA imposed for refusing to consider the marketing plans, et cetera, and so for requiring longitudinal studies that follow participants over time, as opposed to single point in time studies. Wasn't that withdrawn at some point to allow for more flexibility with respect to submission of evidence? That particular line is found directly in the TPL report, Your Honor, and I'll cite to the record. What particular line? I'm sorry. It's the August 17, 2021, internal memo that was subsequently withdrawn, but the particular line of expanding it to, say, all of these, no matter of device type, regardless of the type of ends, all flavored products are equally attractive to youth, flowed through into the TPL report for this specific application, and for hundreds of other ones as well, hundreds of other products. The specific citation is, of course, indulgence here. The enforcement guidance was JA 105 to 106, where it talked about the cartridge-based specific features, and then JA 77 to 78 was the internal memo, and in the TPL report it's JA 31. That was a switch in internal policy without considering the reliance interests of the industry, to the extent that the industry ever should have relied on an enforcement guidance as opposed to a PMTA guidance to begin with, that FDA failed to disclose to industry, and that then used to prejudice industry, and the result was anything but harmless. It was entirely prejudicial. This applicant did everything, checked every box that FDA asked for in its 50-plus page enforcement guidance, did every single study that they were requested to do, and the only reason that they were denied is because FDA failed to give any advance notice that they wanted this comparative efficacy study of all flavored ends products against a specific tobacco-flavored product. FDA cannot deny, they cannot stand here and deny that they did not change that policy. I don't see that the agency has acted in a procedurally unwise way in this sense. They considered a wide variety of studies, and they considered a wide variety of factors, and one of them was, and I looked at this, there were studies showing that all these sales, accessibility and advertising, you could advertise restrictions, you could try to have sales restrictions, and they were all found to be, the studies indicated that the advertising warnings and the rest were not effective in reducing youth use, and then they considered as well your view that these flavored cigarettes might reduce adult smoking, but your burden was to disprove that the FDA's conclusion was that whether they had any effect at all on the reduction of adult smoking was uncertain at best. And the point is, they didn't go off half-cocked. The agency considered a wide array of different subjects pointing to the fundamental factor that they're introducing a whole new generation to nicotine addiction and smoking, and one of the factors that they considered were studies showing that the introduction of nicotine and smoke and the rest were having a permanent, there were studies showing that the nicotine has a permanent negative effect on developing brains. And so in light of all of this, how do we say that the FDA acted arbitrarily and capriciously under the Tobacco Control Act, whose operative phrase is, what would be, that the marketing authorization should rise or fall on what's appropriate for the protection of the public health? That is a broad delegation of authority to an agency right in the very center of its area of expertise, and I don't understand what they did wrong. Your Honor, I agree. I'm not asking this Court to put on its white lab coats and stand in FDA's shoes, but any agency, regardless of its area of expertise, must abide by fundamental rules of due process and when they change policy and shift policy, take account for regulated industries' reliance interests. And the first point Your Honor made, yes, they made that point about, oh, these marketing restrictions don't move the needle. They made that as to cartridge-based products only. I refer the Court to the Chief Judge Pryor's decision in the 11th Circuit in Biddy. That's exactly what was at issue. In fact, what they said in the 2020 Enforcement… I'm sorry, Your Honor. No, I'm sorry. I know your time is brief. But I would have thought that the use, enjoyment of these different products changes so quickly, so that if we said you have to do a cartridge-based product and then you can't use that rule to go forward when they're using other means, that that would hamper the agency indefinitely. They couldn't move as fast as the kids do. All we're asking for, Your Honor, is a fair opportunity to give notice to the industry and for the industry to undertake and complete the requisite studies. What happened here is this is announced after the fact in the denial order in the first instance. There's no fair opportunity. Is there such a thing as a motion for reconsideration? We certainly get a lot of them. I'm sorry, Your Honor. Is there such a thing as a motion for reconsideration? They actually stayed this marketing denial order temporarily and re-reviewed and said, well, because we don't have this comparative efficacy evidence. But we couldn't go back and finish the studies or undertake new studies because they'd already denied the application. Is there anything to prevent you from doing that now? We could submit a new application. The problem is now these products are now off the market. They have to be off the market, and this has effectively destroyed this business. This decision has destroyed my client's business. So why are you here? Well, because in part there are two other pending applications that are still there. It hasn't destroyed the business. Well, it has. They've had to close all their stores. They've had to close all their stores. There's still obviously residual value potentially in these other applications, but they're still there. And to the extent that the court remands this back to the agency with direction to allow these additional studies to be done and allow the application to be supplemented, then it may be able to get back on its feet again. But this was profoundly prejudicial. It was anything other than harmless error, and it comes back to fundamental. I point the court to the Regents' case, State Farm, all these cases that are about fair warning and due process. How many circuits would you throw us into conflict with? At least three. Well, Your Honor, this case is fundamentally different than all the other cases that have gone against the industry so far. It's the same question pretty nearly. Your Honor, no, this is fundamentally different, and the Triton case is mine and one of the 11 circuit petitions, that was my case. This is the only one so far where the applicant checked every single box that was required in the guidance that they provided. There was no statement, no inkling that applicants needed to make a comparative efficacy study comparing flavored products against tobacco flavored products. This case is fundamentally distinct on the facts from the cases that have gone against it. But I think the 11 circuits analysis is instructive here because it goes to this point of what the 2020 enforcement guidance on which FDA was hanging its hat goes to is these cartridge-based products, not all of these. Thank you very much. Thank you, Your Honor. Colleagues, if you have any questions, we'll hold off. All right, thank you. We will hear now from Ms. Conkley. We're happy to hear from you. Thank you, Your Honor. Good morning, and may it please the Court. The courts of appeals for the Fifth, Seventh, and D.C. Circuit have all recently affirmed very similar marketing denial orders. Could you address the last point, or really the only point he made, and so while it's fresh in my mind? Yes, can you just remind me what that point was? I was focused on my own. This was the business about you changed the standard midway. Indeed, Your Honor. And all three of those circuits, the Fifth, the Seventh, and the D.C. Circuit, have very soundly rejected that exact same argument. The D.C. Circuit's – The record was exactly the same there? That the standard changed, that they were put on notice of what they would need to provide? Yes. Yes, that was the exact same argument that was raised in all three of those cases. The Seventh Circuit called it blatantly wrong. The D.C. Circuit, I believe, called it far off base. They had very little trouble disposing of that argument. Okay, I'm happy to hear the bottom line now. Why did they do that? What was the rationale? All three of them held that the notice is right there in the statute itself. Subsection C of the relevant provision, 387J, provides that the FCA is to assess these applications on the basis of whether the applicant has made a showing based on valid scientific evidence that their specific product is appropriate for the protection of public health. That's the only answer I had. Okay, well, it launches into where I was going to go next, so I'll proceed down that path. Ms. Conkley, I'm sorry. Maybe I misunderstood Mr. Heyer's argument. I thought he was arguing that somehow the products at issue had been changed. He focused on the cartridge-based products and then said that all of a sudden the FDA then decided that they were going to focus on a different subset of products. Did I misunderstand that? What he may have been referring to there is in the 2020 enforcement's priority guidance that the agency issued in early 2020. At that point in time, there was substantial evidence that youth substantially favored cartridge-based products. And so the FDA noted that popularity and announced an enforcement priority that it would crack down on those specific products. And then he says that with no notice to his industry, his clients, that the FDA pulled this switcheroo, I guess, for lack of a better term. Well, Your Honor, in that guidance, the FDA goes on to discuss, and again, all three of those other circuits credited the FDA's reliance on this discussion when it reached its ultimate decision here, that the agency had previously back in 2018 enlisted the aid of industry in coming up with marketing restrictions, sales restrictions to try to stem youth access to these products. 2020 guidance discusses at length why all of those measures were completely ineffective. And there's sort of a common-sense explanation for that, which is that youth very rarely attempt to purchase these products on their own with a fake ID, instead they're getting them from their social networks. And so there's just sort of an inherent limitation on what those measures can do. So the FDA noted those limitations. It simultaneously announced that it would be prioritizing enforcement against cartridge-based products. By the time that it got to 2020, or I'm sorry, 2021, and was issuing the MDO issue here, the agency is required to assess all of the evidence before it, and what that evidence showed in the interim between the issuance of the 2020 guidance and when the MDO was issued was that youth had migrated in response to the FDA's enforcement prioritization of cartridge-based products. They had migrated to disposable products. One of the things that interests me, I suppose, as to whether your position has been consistent, in an overall sense it's certainly been consistent because from the get-go it's been a question of whether the public health is put at greater risk by the introduction of these flavored cigarettes. So the overall standard, which is the statutory standard, has remained the same. Now, what we're talking about here is a field in which the evidence is not completely static. There are new studies coming out all the time about comparative risk of candy-flavored cigarettes versus tobacco-flavored cigarettes. There are new clinical studies coming out all the time, and it only makes sense to allow the agency to be attentive to the evolving science. And if every time you're attentive to the evolving science, you're going to be accused of switching your standards, that handcuffs you to a greater extent than I think the statute does. Because they're trying to say, you can only consider this evidence and not this evidence, you can only do this and not that. But I read the statute as giving you flexibility to protect public health. If you don't do it, who will? But this is, so I guess my feeling about the standard is that the scientific evidence is evolving all the time, and that the standard has been a statutory one from the beginning. And that is for the protection of public health. Yes, Your Honor, that's exactly right. And if I could respond to that and also tie that into finishing my thought in response to Judge Diaz's question, neither the science nor the market is static. And what the FDA saw between 2020 and more recently is, in response to the crackdown on a particular type of devices, in particular the cartridges, youth migrated to a different type of device. The consistent through-line that the evidence showed, the evolving evidence before the agency, is that flavor is the driving factor behind youth demand for these products. So if neither the science nor the market is static, under what authority did the FDA have to simply ignore the petitioner's marketing plans, if there was some possibility that those plans might be different than its predecessors? Yes, Your Honor, I'm happy to address that. If I could offer an analogy with respect to the marketing plans, I think it might be useful to think about it as similar to an application for a driver's license for a new driver. It typically comes with a written test and then followed by a road test. It's all part of one unified assessment that the state makes as to whether the applicant is entitled to the license to operate the motor vehicle. Similarly here, you have the threshold showing of whether there's any scientific evidence that supports that the product at issue will present a net public benefit to public health. And so the petitioners here, actually I would note that they concede on page 22 of their reply that the evidence they've submitted does not go to make that comparative showing as required under the statute. And the FDA assessed here, that's sort of similar to them flunking the written test. And what the Fifth Circuit and the D.C. Circuit have agreed is that in light of the absolute failure to present any evidence that would suffice to meet that statutory standard, there's simply no need to move on to the road test in my analogy or hear the assessment of the marketing plans. In that connection, one of the things that concerned me was if we went the other way here, we would be in conflict with, as I see it, three other circuits. And the 11th Circuit in a divided opinion I think went their way, but we have three other circuits that have essentially agreed with your position. Am I mistaken in that? No, Your Honor. The Seventh, the Fifth, and the D.C. Circuit have very soundly rejected all of the exact same arguments that the petitioner is raising here. So we'd be on a thin side to say the least of a circuit split, correct? That's right, Your Honor. The only decision that has so far come out partially in favor of the applicant is the 11th Circuit's Biddy decision. That was a limited holding that remanded simply for consideration of the marketing plans. I would note some distinctions with that case. There was a reference there to a unique sort of innovative restriction that was proposed. I think it was called a trace and verify restriction in which they were advancing technology that would, if a device wound up in the hands of a child, you could trace it to the adult that it came from. There's been a whole lot of evidence about the significant risk to youth of this particular product. It seems to me that a society in general has a particular responsibility to its children and to upcoming generations. We owe that to them. They cannot protect themselves against this kind of, I won't say predatory, but against this kind of alluring behavior that seeks to convince them that it's no different from a Baby Ruth or a pretty musketeer bar. But we owe this to them. Each generation owes it to the succeeding generations to do the best we can to make sure that they grow to adults in a way that maximizes their health. We owe this to children and to young adults. And I don't know, I see, I have read through a lot of this record and I see many, many studies and things indicating what the risk to these young people are. And I don't know what the benefits of it are. They can get the sweets and they can satisfy a sweet tooth in many ways other than introducing nicotine into their brains and into their system and this is a gateway thing because smoking, there are a number of other studies that were before the FDA indicating that smoking is a habit and that it's a habit that's formed at youth and that once you get accustomed to the idea of a weed in your mouth, that's going to be a habit that's going to carry on through to adulthood because most adult smokers began the habit in their mid-teen years. And that too is part of what the FDA was considering as I understand the record. Yes, Your Honor, and that's written right into the statute. Again, the FDA is required to conduct a balancing analysis and to assess on the one hand the very well-established harms that these products present to children against the potential benefits to adults. There is a very substantial scientific consensus that is laid out in great detail in the TPL in the record in this case that lays out all of the evidence that Your Honor was just referencing for just how harmful these products are to children, the harm that nicotine does to developing brains, the fact that essentially all new users of these products are below the legal minimum age to purchase them and therefore they become addicted and potentially for the rest of their lives. And the FDA has repeatedly reiterated that any potential benefit that these products may have to adults who have been using combustible cigarettes in switching over to a less harmful product absolutely cannot come at the expense of addicting a new generation going forward. That is the statutory standard that the FDA applied here. It assessed that consensus evidence and it noted that because the harms to children are so great and because it is required to conduct a balancing analysis, it's incumbent on the petitioner to meet its burden to show a specific benefit to adults sufficient to outweigh those harms. That's a product-specific inquiry. I'm sorry. No, I just say along that line maybe you could talk to me a little bit about the agency's changing views on the criticalness of the marketing plan. The FDA had earlier said that it was critical to the agency's determination of whether a new product is appropriate for the protection of public health. But there wasn't any consideration of the marketing plan here, was there? Yes, Your Honor. And that was error, wasn't it? I mean the question is whether it's harmless or not. The agency does not concede that it's error. I would again, you know, go back to the analogy. Well, isn't the public entitled to take the agency at its word? I mean it had said in the Federal Register that the determination, the marketing plan was critical to its determination. And Your Honor, it would be critical to any, before the agency can issue a marketing granting order, it would need to assess the marketing plan and determine that it's efficient. In the same way that you need, in other words, both the threshold scientific showing of a net public benefit to public health and the marketing components and the back-end restrictions. They're both necessary conditions, neither is sufficient. And here where the- Well, if neither is sufficient, then you had to talk about both. Well, but the petitioner here concedes, again on page 22 of their reply, that the evidence they submitted does not go to that comparative benefit that the statute requires them to make. And so when the agency went through five different categories of information or evidence, purported evidence that they submitted, the agency assessed it very carefully and in detail. It concluded that none of it, you know, was robust and reliable and sufficient to meet that standard. In the absence of that showing, there was no need to move on to the, you know, there's no need to go from, you know, the written test to the road test in my DMV example. If you fill your written test, there's no point. Counsel, is the concession that you're talking about that your colleague on the other side made a concession made on appeal or one that was apparent to the FDA on the record when it decided not to consider the marketing plan? No, Your Honor. At the point where it issued the MDO, you know, it assessed all the categories of evidence that the petitioner submitted and the FDA assessed that none of that evidence was sufficiently robust and reliable to meet their burden to make a showing of net benefit to public health for their specific products. That's not the question you asked. No, the question was whether or not the concession that you highlighted was made during the process that the FDA considered whether or not to review the marketing plan or is the concession made after the fact? The concession was made in their reply brief. Okay. Well, that sounds like a harmless error argument. Sure. And I'll turn to that. There's one other quick point I'd like to make, which is just that I'd like to note that in any event the FDA did assess a three-page overview of the marketing plan. That's at joint appendix pages 312 to 314. It's a three-page summary of their much longer 110-page plan, which the agency conceivably did not look at. But the agency did assess that similar to what was noted in the Fifth Circuit decision as part of its review. Moving on to the harmless error standard that Your Honor just referenced, the Supreme Court in the Shinseki versus Sanders case cited in our briefs has laid  And in order to meet that burden to show that the error harmed them somehow, they need to show some sort of probability of likelihood, some possibility that the outcome could possibly be different were this to be remanded. Here the petitioner is not contending. And, in fact, if the court were to go back and look at the marketing plan, which is in the record, it's there for all the world to see, the restrictions and measures that they're proposing are things like age restrictions, they intend to market to adult audiences only, they have special training protocols in place, and they've got age verification requirements. Those are all garden variety restrictions that the FDA, in its experience, has found to be completely inadequate to restricting youth access and demand for these products. That's discussed in great detail in the 2020 guidance and also relied on heavily in the TPL that was attached to the ultimate decision here. So there really would be no point in remanding so that the court could consider the same standards or the same measures that it has already found generally to be insufficient. The petitioner is not making the case that it has proposed anything innovative or material or different from the general, you know, run of measures that the agency has assessed and its expertise to be insufficient to tip the scales or make the difference, particularly in the lack of any showing that their products have enough benefit to public health. One more word, excuse me, one more question about the marketing plan. Is it your position, representing the agency, that there could never be an effective marketing plan that would, if that's so, why say that the marketing plan is crucial? No, Your Honor, that's not the agency's position, and it has been clear that to the extent that industry or a particular applicant proposes something innovative or material or different, then that would require a harder look. There are some applications, I understand. But you didn't look at it here, so you don't know whether they did. Well, the record is there for the court to see, and we do know that there's nothing in there that was different. I can say that there are a couple of companies that are exploring some new technology known as access restrictions. My understanding is that it works similar to, like, using your thumb to open your iPhone. You would use it in a similar way with a vaping product. So they have to be a 21-year-old thumb? Exactly. Your Honor, this is a new innovation that certain segments of the industry have come up with. They've proposed in those applications. The FDA has they're assessing those applications. They're under review, so I can't speak to how they'll come out. But something like that or some other innovation that could possibly tip the scale could make the difference here. And to be clear, even in cases where the applicant makes an evidentiary showing, which was not done here, that marketing plans are essential. They are a necessary, you know, component of a final granting order. It's just that you don't get to that stage unless you make that threshold evidentiary showing that your product specifically is going to provide more benefit to adults acquitting than the harm inflicted on children and, you know, addicting a new generation of, you know, nicotine users going forward. I see that I'm almost out of time, so I'll ask if there's any further questions. Thank you very much. Thank you. In closing, we ask that the courts deny the petition for review. I have four points I'd like to try and get through very quickly. First, and pardon the righteous indignation, it is absurd that counsel stands here and says that FDA reviewed the marketing plans. JA35, we have not evaluated any marketing plans submitted with these applications. The marketing denial order, JA12, says scientific review did not proceed to assess other aspects of the applications other than whether there was a comparative efficacy evidence of randomized controlled trial or longitudinal cohort study. That is not supported by the record. Secondly, on the issue of the marketing plans and the suggestion that there's nothing here that was any different than what FDA had reviewed previously, I'm going to point your honors to JA312, which is part of the marketing plan. One thing that Avail did uniquely and differently than what FDA has pointed to in the past is they had nondescriptive flavor names that didn't describe the flavor on the labels at all. And when they did, they went and they did a perception study of adult consumers. They found that consumers found that that tended to make the products more attractive to older adults, not attractive to youth. That was an innovative and different... I read with some care your objections to the agency process and to the agency standard. And the reservation that I have is it seems to me you may be encouraging us to miss the forest for the trees. And the forest, in my judgment, is this statute. And it's discharge of responsibility to the agency in an area where the agency not only has expertise, but is dealing with a shifting and evolving situation. And it seems to me that the issue comes back to where this argument opened. And that is that these e-flavored cigarettes presented a distinct risk to the health of young adults in our society. And we can talk about this point and we can talk about that. But that's the bottom line. That's the agency's consistent position. And it seems to me we are in danger of going off the rails here and trying to overlook what is the standard of review and some deference under a fairly broad delegation of authority under the Tobacco Control Act. And I really do think that the health of the younger members of our society was what the agency started out with. It's what it ended up with. And I'm just, sometimes it's important not to lose sight of the major point. Your Honor, if I can respond to that. The other point I wanted to hit here briefly. I'm concerned that the court is going to swallow the bromides. We're not seeking marketing authority or marketing authorization to offer these products to youth. In fact, there is zero evidence that any youth have ever consumed a single avail product. And unlike the cartridge-based products and unlike the disposables with their own features, the FDA and its 2020 enforcement guidance, things like ease of use, rechargeability, high nicotine content, et cetera, said make those products particularly attractive to youth. That's not the case with these flavored bottle deals. These are very low nicotine bottled e-liquids. And these are the products, if you look at the National Youth Tobacco Survey results, that are the lowest of use by youth. And again, there's zero evidence that any youth have ever used an avail product. So this is for these products that avail wants to market to assist adult smokers, cigarette smokers. Those are the people that are looking at emphysema and lung cancer and those things. We shouldn't lose sight of them. And respectfully, I don't think the court should either. Those are the people facing the nearest and most prejudicial harm when it comes to public health. But again, what I'm asking the court to do is to regulate and put some guardrails around an agency that does not respect fundamental due process rights here. It's not an issue of the substance. The agency is entitled to weigh the punitive benefits to older smokers against the risk to younger smokers. And it's got to make those sorts of comparative judgments, as I understand the statute. And it did. It said that the risk to benefit to older smokers was illusory and uncertain at best. And the risk to younger, of introducing younger Americans to these cigarettes was concrete and palpable. And that sort of comparative judgment is explicitly entrusted to the agency to make. But, Your Honor, they ignored, because they didn't look at it, the evidence of benefit to adult smokers that was found in my client's application. Like when they did a perception and intent cross-sectional survey where 18 to 25 percent of adult smokers said they would be interested in trying these products to potentially quit. Because that wasn't a longitudinal cohort study or a randomized control trial that followed participants over time. Again, a switch and a new demand after the fact, FDA ignored it. It didn't fit into their 10 months after the fact new imposed evidentiary requirement, standard for evidence, as they said in their July 7th internal memo, that they imposed 10 months after these applications went in. All we're asking for is reasonable, fair notice and fair warning and an opportunity to meet it. And if this court remands, as we're requesting, and directs the agency to allow us to undertake those studies, then my client will feel like they've gotten a fair shot. But otherwise, the agency can always change the rules to always deny the applications. Thank you, sir. Thank you. And I'm sorry we can't come down and shake your hands, but I wanted both of you to know that we appreciated your argument. Thank you so much.
judges: J. Harvie Wilkinson III, Albert Diaz, Diana Gribbon Motz